IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


ARTHUR D WEISS,

       Plaintiff,

v.                                     CASE NO. 1:05-cv-00158-MP-AK

CITY OF GAINESVILLE,

       Defendant.

_____/

## O R D E R

This matter is before the Court on Doc. 201, Motion for Summary Judgment by the City

of Gainesville. Plaintiff has responded, Docs. 316-17. Plaintiff also filed his own Motions for

Summary Judgment, Docs. 264 and 271, to which the City responded, Doc. 297. Also pending

are various discovery, case management and other motions which will be dealt with seriatim,

below. A two-day hearing was held, during which the Court received evidence and testimony

from both sides. See Docs. 371 and 374. For the reasons given below, summary judgment is

granted in favor of the City and against the Plaintiff.

The Plaintiff, Arthur D. Weiss, (hereinafter "Weiss") at all relevant times owned a 940

acre parcel, that is now located in the City of Gainesville, Alachua County, Florida. This parcel

has been known as the Gainesville North Community Activity Center PUD and has also been

known as The Greenways of Gainesville. Complaint, Doc. 113, ¶ 6. The land is located

generally between U.S. 441 and N.W. 43rd Street. (Ex. 149[1] at p. RPC 0088). Prior to its

_____

[1]For the sake of convenience, the designation "Ex." refers to exhibits to the City's Motion
for Summary Judgment, Doc. 201. Because of the sheer number of documents in this case,
however, the exhibits can be found as attachments to many but not all of the docket entries in the
range Docs. 205-273. The text of those docket entries describes each attachment by exhibit
number.

annexation into the City, in 1992 (for 720 acres) and in 1993 (for the remaining 220 acres), described more fully below, the Weiss 940 acres were located in unincorporated Alachua County. (Ex. 776**;** Hilliard Third Affidavit, found attached to Doc. 204). Upon its incorporation into the City, the 940 acres of Weiss land was located on the extreme northwest end of the city limits. Its location is visually depicted in Exs. 125 and 581, relative to the surrounding roads and highways. (Exs. 125, 581, and 59 at p. Weiss PR 004591). The 940 acre Weiss parcel is currently divided by the City's N.W. 43rd Street, as depicted in Exs. 581,152 and 116, with approximately 220 acres located immediately west of N.W. 43rd Street, and the remaining 720 acres located immediately east of N.W. 43rd Street.

In 1989 Weiss sought to have the City annex his land in return for the City agreeing to allow him to develop the land in accordance with a development plan he and his team had devised. In furtherance of Weiss's desire to have his 940 acres annexed into the City of Gainesville, Weiss hired the South Florida law firm of Ruden Barnett in early 1989 and directed that it engage in contract negotiations with the City of Gainesville for the purpose of securing an Annexation Agreement, with a proposed "conceptual land plan" attached thereto, as "Exhibit B", under which Weiss hoped to be able to ultimately develop his 940 acre property. Doc. 203, ¶ 37. In the Agreement, Weiss agreed to provide certain services and to include certain features in his development (setbacks, curbage, etc.) in return for the City keeping the zoning of the property in a class appropriate to the conceptual land plan.

Between May and October of 1989, Weiss's lawyers engaged in a lengthy, protracted negotiation process with the Gainesville City Attorney's office for the proposed terms of the written Annexation Agreement. <u>See</u> ¶¶ 34-68 of Doc. 203. The result was an Agreement with,

among others, the following provisions:

In Section 9.6 of the Agreement entitled <u>Term</u>, the parties agree as follows :

9.6 **Term.** This agreement shall become effective upon the annexation of the Property into the City...

In the Section 3.0, the parties agree to this regarding annexation:

3.0 **Annexation**:  Simultaneously with the execution of this Agreement, Owner has filed a letter of consent for annexation of the Property by referendum into the City in compliance with Section 171.0413, Florida Statutes, and all other applicable state and local laws and regulations.  The City shall immediately initiate the process to establish that annexation pursuant to a referendum in compliance with Section 171.0413, Florida Statutes, and all other applicable state and local laws and regulations.

Also, in the "Whereas" clauses at the start of the Agreement, the parties state,

**WHEREAS,** in reliance upon the undertakings and obligations of the City, as set forth herein, Owner has, simultaneously with the execution of this Agreement, filed a letter of consent for annexation of the Property by referendum into the City pursuant to Section 171.0413, Florida Statutes based upon the understandings which form the basis of this Agreement, and

**WHEREAS**, the City desires to annex the Property into the City and, to that end, shall initiate the process required by law to annex the Property by referendum pursuant to Section 171.0413, Florida Statutes...

Thus, wherever the Agreement discusses annexation, it specifies that the proposed annexation would be of all 940 acres and would be conducted by a referendum vote "pursuant to Section 171.0413, Florida Statutes".  No other form of annexation methodology was mentioned during the negotiations of the parties, nor could it have been, since the method of annexation provided under the "The Alachua County Boundary Adjustment Act" (hereafter the "ACBAA") did not exist until 1990.  (This Act is discussed in great depth below.)

In 1989, a Section 171.0413 annexation required that there be a "dual majority" affirming vote; i.e., that a majority of the voters residing in the area sought to be annexed into the City vote

in favor of the annexation, **and** that a majority of the voters of the City of Gainesville also vote in favor of the annexation.

There is no evidence that the parties specified that method of annexation accidentally or casually. Instead, it is undisputed that counsel for the City and for Weiss ardently negotiated the terms of the 1989 Annexation Agreement (hereinafter, the "Agreement"). For example, when Weiss demanded that the final Agreement provide Weiss with "vested rights" to develop his 940 acres in accordance with the "Exhibit B" conceptual plan attached to the Agreement, the City refused and struck those "vested rights" terms from the draft. Id. at ¶ 48. As another example, when Weiss demanded that the final Agreement contain a provision that prevented the City from amending its land use plan provisions, or its zoning provisions, or any other ordinances unless the City could establish "substantial evidence on the record that such modification is necessary to avoid a risk of injury to public health, safety or welfare", the City rejected that proposed term limiting its plenary power and right to amend, and struck that proposed language from the draft. Id. at ¶ 51. As yet another example, when Weiss demanded that the final Agreement contain a provision that imposed a "covenant" by the City that "all public facilities and services, including . . . roads . . . will be available concurrent with the development of the [Weiss] Property at levels of service consistent with the City of Gainesville Comprehensive Plan. . .", the City refused and struck that obligation from the final draft. Id. at ¶ 53. None of these terms requested by Weiss ended up in the final, signed Agreement.

In 1989, an elected five-member City Commission governed the City. The proposed, written Annexation Agreement was brought to the City Commission in October, 1989, on second reading for a formal vote. The Commission voted to approve the proposed 1989 Annexation

Agreement, and it duly authorized the Mayor to sign it on behalf of the City, which he did. Then, in accordance with the obligations imposed upon it under the Agreement, the City immediately initiated, noticed and held a referendum vote of the 940 acres pursuant to Section 171.0413, Florida Statutes. The annexation referendum took place on December 5, 1989. The bargained-for referendum vote under Section 171.0413, Florida Statutes, failed. Shortly after this failed vote, the City Commission, at its public meetings, voted to accept the results of the Board of Canvassers which certified that the Weiss Annexation Agreement referendum vote failed.

In 1990, however, the State of Florida changed the way annexation was done in Alachua County through "The Alachua County Boundary Adjustment Act" (hereafter the "ACBAA"). The ACBAA provided, in part, a means for annexation of property located in Alachua County into governmental entities, like the City of Gainesville. However, unlike an annexation referendum under then-existing Section 171.0413, Florida Statutes, an annexation referendum under the ACBAA did not require, nor provide for, any "dual majority" affirming vote as a condition to a successful annexation referendum thereunder. Rather, it only required a vote by the voters of the City; it did not require any additional affirming vote by the voters residing in the area sought to be annexed under the ACBAA. Another method of "voluntary annexation" provided for under the ACBAA did not require a referendum vote at all.

In the Spring of 1992, the City, on its own initiative, commenced a "large scale" annexation of unincorporated land in Northwest Gainesville using the provisions of the ACBAA. This initiative did not at first include the Weiss lands. In April, 1992, however, Weiss requested that his 720 acre parcel, which was located immediately adjacent to this proposed large scale

unincorporated land, be included within this proposed large scale annexation. The City acceded to his request, and Mr. Weiss has not presented any evidence that there were any conditions, promises, or references to the defunct 1989 Annexation Agreement. That large scale annexation was successful under the provisions of Florida law which allow annexation without a referendum vote, and these lands, including Weiss's 720 acre parcel, were annexed into the City, effective September, 1992.

In the spring of 1993, Weiss filed a petition for voluntary annexation with the City, under the ACBAA, under which he asked to have his remaining 220 acres voluntarily annexed under the ACBAA method that did not require any referendum vote. This was also an annexation sought pursuant to the ACBAA, and not pursuant to Section 171.0413, Florida Statutes.[2]

With regard to this annexation, Mr. Weiss contacted Mr. Norman Bowman, who was the "Director of the Department of Community Development" for the City.[3] Mr. Weiss inquired how to get his remaining 220 acre parcel annexed into the City. Id. at ¶ 85. On October 27, 1992, Mr. Bowman wrote Weiss and told him that the ACBAA provided a mechanism for a "voluntary annexation", and the mechanism would require Weiss to file a petition with the City

---

[2]The Ordinance that the City considered at first reading on May 17, 1993 specifically recited that the annexation of Weiss's 220 acres was being accomplished pursuant to the ACBAA. It did not contain any references to the failed 1989 Annexation Agreement, nor did the language in the Ordinance re-affirm the terms of the failed 1989 Annexation Agreement. The Ordinance recited that, "the Alachua County land use plan and zoning or subdivision regulations shall remain in full force and effect in the Area described in Section 2 of this Ordinance [i.e., the 220 acres] until the Area is rezoned by the City of Gainesville to comply with its comprehensive plan".

[3]The Director of Community Development is a staff position. He reports to the City Manager. The Community Development Director is not a member of the City Commission, nor is it a "Charter" position under the City's Charter.

Commission requesting voluntary annexation. Bowman also responded to Mr. Weiss's questions

about what types of Comp Plan "future land use" designations and "zoning" designations the

City planned on placing on Weiss's lands that were annexed into the City.  Bowman's letter told

him that the City had an "ongoing process of amending the City's Comprehensive Plan and Land

Development Regulations", and that Bowman intended to "propose the same land uses on your

property that were proposed upon in the 1989 Annexation Agreement." Doc. 203, ¶ 88.

(Emphasis added).

Nowhere in his letter to Weiss did Mr. Bowman say that the City considered the 1989

Annexation Agreement to be legally operative, or that the City was in any way legally bound to

actually implement the land uses and densities or intensities that had been set forth in the 1989

Annexation Agreement.  Moreover, as a staff employee, Mr. Bowman was not legally authorized

to bind the City to any Annexation Agreement, nor authorized to agree to "legally re-invigorate"

or "re-ratify" its terms so as to now make the 1989 Annexation Agreement binding on the City.

Additionally, the other letters, some from Weiss's counsel and some from the City' s staff,

described in ¶¶ 91 to 96 of Doc. 203, clearly show that the City and Weiss acknowledged that the

Annexation Agreement was not considered binding by the City.  Also, neither the Urban Service

Report prepared before the vote on the annexation nor the ordinance which implemented the

annexation mentioned the Annexation Agreement or made it binding on the City.  See Doc. 203,

¶¶ 100-103, 108.

Finally, on June 7, 1993, Mr. Weiss faxed a proposed letter to the City which would have

stated, "Upon completion of the annexation, the entire parcel described in the Annexation

Agreement between Arthur D. Weiss and the City of Gainesville...will have been annexed into

the City of Gainesville and the Agreement is and will be binding upon the parties thereto." The

City immediately responded that it did not believe the agreement would be in effect. See Doc.

203, ¶¶ 115-16 (reciting the City attorney's contemporaneous notes of a phone call with

Plaintiff's then counsel and also noting that Plaintiff's then counsel testified that he had no

independent recollection of the conversation). Indeed, nothing in the record shows that the City

ever gave any signal that it considered the Annexation Agreement legally alive at all after the

failed referendum vote. Instead, the record shows the opposite to be true. See, e.g., Doc. 203, ¶

135.

After the annexation of the 220 and 720 acre parcels, Weiss began the process to develop

the 720 acre parcel, and so undertook to have the City alter its Comprehensive Plan to match his

desired use of the property. Under Florida law, each city must have a "Comprehensive Plan."

(Chapter 163, Florida Statutes). A Comprehensive Plan ("Comprehensive Plan" or "Comp

Plan") is a collection of materials, in descriptive form, written or graphic, as may be appropriate

to the prescription of principals, guidelines and standards for the orderly and balanced future

economic, social, physical, environmental and physical development of an area. (§163.3177(1),

Florida Statutes). The Comprehensive Plan includes a number of "elements," including a "future

land use plan," a "traffic circulation element," "sanitary sewer, solid waste . . . and natural

ground water" element, a "conservation element" (which includes "wetlands"), and other

elements. (§163.3177(6), Florida Statutes).

The Comprehensive Plan, as an adopted document by each governmental entity, is based

on data and analysis that "represents a vision for a community" going forward. It is required by

state law. (Mimms depo. at pp. 26-30). It applies a "future land use category" to every piece of

property included within the jurisdiction of a city. (Mimms depo. at p. 27). The future land use for a particular piece of property is reflected in the "text" of the Comprehensive Plan, and is visually shown on the future land use "map." Both the text and the map go "hand in hand" and must be read together.

Under Florida law, every parcel of land within a City must have a 'future land use designation' and a corresponding 'zoning designation' which, unless and until changed, govern the future potential uses of that land. (Hilliard Third Affidavit at ¶19). A Comprehensive Plan sets only "land use" designations; it does not set any "zoning" designation for land. (Chapter 163, Florida Statutes; Third Hilliard Affidavit). In the City's Comprehensive Plan, the "future land use" designation for each parcel of land is referenced in the written text of the "Policies" contained in the written Comprehensive Plan language, and is visually depicted on the "Future Land Use Map." (Third Hilliard Affidavit). Land cannot be developed or used by its owner in a manner that is inconsistent with its land use designation under the Comprehensive Plan. (Causseaux 7/25/06 depo. at pp. 11-12).

In July of 1993, the City started the Land Use amendment process to bring recently annexed land, including the Weiss 940 acres, into the City's Comprehensive Plan in order to designate a specific "future land use" for that land. (Ex. 41 at City 001202). Eventually, the Plan Board stated that it was recommending to the City Commission, per the requests of Mr. Weiss' representatives and City Staff's input, that "Policy 2.1.1" of the City's Comprehensive Plan be amended so as to create a "Planned Use District" ("PUD") future land use "overlay" to

apply to the Weiss land.[4] (Ex. 788 at pp. 001303-04). (This Comprehensive Plan Amendment

was designated Petition #233 LUC-93 PB.)  That is, the Petition would "amend the Gainesville

Comprehensive Plan, 1991-2001, Future Land Use Map from County Residential low (1- 4

units/acre) to PUD (Planned Use District) to allow a mix of residential, office commercial,

public service and conservation uses." (Exs. 797, 798).

      The Report recommended that the PUD land use overlay in the Comprehensive Plan have

an automatic reversion provision such that in the event the property owner failed to secure a

"planned development" ("PD") rezoning of the PUD overlay property within one year after the

PUD overlay was applied to the land, the PUD overlay would be automatically deemed "null and

void," with the land use reverting to the underlying designation.

      An "overlay" is one of the most generally used planning methodologies to accomplish a

PD. (Carpenter depo. at p. 294).  It is an additional "layer" of land use that is placed over the

underlying land use that remains, while the overlay is in place. (Percy 8/21/06 depo. at pp. 358-

59).  In the case of a "PUD overlay," as on Weiss's land, the overlay does not remove the

underlying land use on that land, but the underlying land use remains in place.  As long as the

stated conditions for the PUD land use overlay to stay in place continue to exist, the PUD land

use overlay remains in place over the land, and the underlying land use remains inactive.

However, if the conditions for the PUD overlay cease to exist, the overlay goes away and the

underlying land use becomes the operative land use for that parcel of land. (Hilliard 6/20/06

depo. at pp. 263-67).

---

      [4]In the Petition, Weiss' land was referred to as "Gainesville North Community Activity
Center"

The City submitted the proposed language for an ordinance amending the Comprehensive Plan in this way to the Florida Department of Community Affairs (hereinafter "DCA") for review and comment. The DCA approved the automatic reversion language with one small change not relevant to this case. After DCA approval, the City submitted the following proposed amendment language to Mr. Weiss for comment:

> 2.3.8. The following standards shall be used to develop the Gainesville North Community Activity Center:
>
> * * *
>
> m.      The planned development zoning ordinance consistent with the PUD overlay district must be adopted by the City Commission within 4 years or the overlay district shall be null and void, and the Future Land Use Map shall be amended accordingly upon proper notice. The underlying Future Land Use Map Category is "Single-Family"; such category is inapplicable as long as the property is developed and used in accordance with the development plan approved in the ordinance rezoning this property to Planned Development "PD". (Ex. 46A).

In response, Mr. Weiss expressly approved of the amendment and even acknowledged that under subsection m, set out above, he had four years to gain final PD rezoning. The letter stated,

> The Amendment in Policy 2.3.7 changes the total maximum percentage of single family to 65 and adds to Policy 2.3.8 at subsection M, that, in essence there shall be four (4) years to achieve approval of the planned development.

Doc. 203, p. 175.

On August 22, 1994, at a publicly noticed meeting, the City Commission, at second reading, adopted the foregoing proposed Comprehensive Plan amendments, via Ordinances 4000 and 4001. (Exs. 46A, 48; Doc. 158). That is, under that adopted 1994 Comprehensive Plan amendment, and Ordinances, Weiss was given a deadline of August 22, 1998 (i.e., four years from the adoption date of August 22, 1994) to secure PD rezoning from the City for his 720 acre parcel over which the City had placed the "PUD overlay." (Exs. 46A, 48; Doc. 158).

The City then submitted the ordinances and the amendment to the DCA for a review as to

their compliance with Florida law.  By letter dated October 17, 1994, (Ex. CC to Doc. 158), the

DCA wrote the City, on Department Secretary Linda Loomis Shelley's letterhead, informing the

City that it had completed its review of Ordinances 4000 and 4001 (and other submissions from

the City). The DCA stated:

> The Department has completed its review of the adopted Comprehensive Plan
> amendment (Ordinances No. 4000, 4001. . . . . .) for the City of Gainesville, as
> adopted on August 22, 1994, and determined that it meets the requirements of
> Chapter 163, Part II, Florida Statutes, for compliance, as defined in Subsection
> 163.3184(1)(b). The Department is issuing a Notice of Intent to find the plan
> amendment In Compliance. The Notice of Intent has been sent to the Gainesville
> Sun for publication on October 18, 1994.

Weiss' team began work on the project, calling it the Greenways of Gainesville.  Because

of its size and complexity, the Greenways project was required to be filed as a "Development of

Regional Impact" ("DRI") (R. Carpenter 8/3/06 depo. at p. 209; Causseaux 7/25/06 depo. at p.

14; Percy 7/19/06 depo. at p. 17).   Under Florida law, the North Central Florida Regional

Planning Council ("NCFRPC") and its constituent agencies (FDOT, Alachua County, the City of

Gainesville, FDEP, etc.) were required to review the ADA/DRI application for its 'sufficiency.'

(Exs. 340 and 140).  After this review, the RPC was required to inform the DRI applicant of any

'insufficiencies' and was entitled to request that the applicant provide additional information in

order to render the application sufficient for governmental review. (Exs. 140, 340; §380.06(10),

Florida Statutes).

If requested by the RPC to provide additional information to permit the RPC and its

constituent agencies to review the DRI application (called "sufficiency requests"), the applicant

was legally required to notify the RPC within 5 days as to whether the applicant agreed to

provide the requested information. (Ex. 340; §380.06(10)(b), Florida Statutes). The applicant was required to respond to two sufficiency requests by the RPC. (Ex. 340; §380.06(10)(b), Florida Statutes). After being requested twice, the applicant had no legal duty to provide more information and could, instead, refuse to provide the requested additional information and demand that the RPC schedule the DRI application for the required hearings. (Ex. 340; §380.06(10)(b), Florida Statutes). Alternatively, even though not legally required to provide the RPC with additional information after a second RPC sufficiency request, the applicant can waive the "two maximum RPC information demand" provision, and agree to provide the additional requested information. (Ex. 340; §380.06(10)(b), Florida Statutes).

If the applicant requested the RPC to set his DRI application for hearing, Florida law required that the RPC promptly notify the governmental entity (i.e., the city or county) in which the DRI project was located (i.e., the 'host entity') to schedule a public hearing on the DRI application. (§380.06(10)(c), Florida Statutes). Upon the applicant's request for hearing, the RPC's full Council is required under Florida law to itself hold a hearing on the DRI application. and, within 50 days, to issue a written "Report and Recommendation" to the host city. In the Report and Recommendation, the RPC should recommend approval or denial by the host city of a development order, or what conditions the RPC recommends should be attached to same. (§380.06(12)(a), Florida Statutes). When the host city received a request by the RPC for a hearing on the DRI application, it was required to hold a hearing within 90 days. (§380.06(11)(d), Florida Statues).[5]

---

[5]Ex. 145 sets out the "steps" of a DRI review from the NCFRPC records as of April 21, 2003.

In this case, Weiss' team submitted its DRI application in December of 1998. The NCFRPC conducted its review and issued a report in January of 1999. The report found Weiss' DRI application insufficient because it did not accurately report transportation impacts, did not adequately assess the environmental impacts of the project, and wrongly included rights Weiss asserted were his based on the Annexation Agreement of 1989. Doc. 203, ¶¶ 481-86. Weiss responded on March 5, 1999, but the NCFRPC found that that response was insufficient in that it continued to have problems with the transportation methodology and with assessment of environmental impact, specifically the avoidance and minimization of proposed wetlands impacts. Id. at ¶¶ 496 to 501.

Weiss provided his second response on July 28, 1999, and indicated therein that it was his "final response to sufficiency questions." Id. at ¶ 507. On August 27, 1999, the NCFRPC sent a letter to Weiss, finding his response again insufficient and stating, "In accordance with Section 380.06(10)(b), Florida Statutes, you should communicate your intention to provide the information/clarification requested in writing to the City of Gainesville and to the North Central Florida Regional Planning Council within five working days of receipt of this letter." The insufficiency letter stressed the environmental concerns. The DRI review agencies communicated to Weiss that given the environmentally sensitive nature of the Weiss land, approval of the Weiss DRI project would likely not be recommended by them for approval unless Weiss agreed to significantly reduce the density and intensity of his proposed development. (Ex. 65: FDEP letter of August 17, 1999). Weiss' project manager, John Percy sent a letter to NCFRPC indicating that Weiss' team would not attempt future sufficiency responses. Id. at ¶ 514.

After Weiss' letter, the NCFRPC informed the City, and the City set the matter for the

public hearing required by Fla. Stat. §380.06(11)(d).  The time of the hearing was to be worked

out with Weiss' team and was to occur between November 15, 1999, and December 2, 1999.  Id.

at ¶ 516.  Weiss, however,  sent a letter to the City requesting it to indefinitely postpone that

hearing but to instead engage in a workshop with Weiss' team that was open to the public as

well.  Id. at ¶ 517.  The City agreed to postpone any hearing and held the workshop on October

4, 1999.  Nine days later, Weiss' lawyer sent a letter to the NCFRPC stating,

> It is our view that pursuant to F.S. 380.06(11)(d) we are waiving the compulsory
> public hearing dates until further notification. Notification of the withdrawal of
> waiver will constitute notice that the time frames for public hearings will
> recommence only upon notification of withdrawal of waiver and that you will be
> entitled to the original 90 days from receipt of said withdrawal.

Id. at ¶ 526.  In November and December of 1999, and January of 2000, the NCFRPC held

meetings with Weiss' team, to discuss the transportation and wetlands concerns.   Later in

February 2000, the City and Weiss conducted a second workshop, which was also open to the

public.  Eventually, in May of 2000, Weiss' team submitted its second "Final Traffic Study,"

which the NCFRPC still found insufficient on June 22, 2000.  In response to this letter, Weiss'

team indicated that it would again attempt to provide additional information.  The team did not

request a hearing, despite its legal right to do so.  Additionally, as of October 23, 2000, the date

that the City Commission denied the final request for extension (discussed below), the Weiss

team had not provided all the information and analysis needed for the traffic or wetlands

concerns of the various agencies.  See id. at ¶ 608, setting out the deposition testimony of

Plaintiff's traffic study consultant, John Moore, and the City's staff transportation analysts.

Simply put, the City was still unable to calculate the proportionate share of future traffic impacts

attributable to the project or to assess the full environmental impact.

In the meantime, as Weiss worked on the DRI process, the time limits under the original Ordinance creating the PUD Overlay began to run out. In the summer of 1998, Plaintiff petitioned the City of Gainesville to amend this Comprehensive Plan to extend the PD Rezoning deadline on his PUD Overlay for one year. The City Commission approved the one year requested extension to August 22, 1999. The next year, the City again granted an extension and the deadline was extended through August 22, 2000. A third extension of the PD Rezoning deadline was sought in June of 2000.

In the June 23, 2000 cover letter accompanying Weiss's third extension application, Weiss Project Manager John Percy informed the City that: "We submitted our PD Concept Plan in December of 1997 and, of course, thought we would be done by now, but the DRI process has been more complex than expected, necessitating the requested time extensions." Doc. 203, ¶ 244 (setting out text of cover letter accompanying June, 2000 Comprehensive Plan Amendment Application by Weiss's Project Manager, John Percy). At a public City Commission Meeting on October 23, 2000, the City of Gainesville City Commission considered the extension request and denied it. Throughout this process of obtaining extensions, the Amendment contained the same automatic reversion to single-family use language to which Weiss had previously agreed.

After the October 23, 2000, denial of Weiss' third extension request, the City considered the PUD Overlay automatically removed and that the future land use of the property under the Comprehensive Plan reverted to single-family use. See testimony of Mr. Hilliard (Doc. 203, ¶¶ 336-338), Pegeen Hanrahan (Doc. 203, ¶ 359) and the recommendations of the Planning Board Staff (Id. at ¶ 348). Later, from December 2000 to March 4, 2002, the Commission began a

series of hearings to update the land use map to match the Comprehensive Plan, including a

change to the designation on the map regarding Weiss' property.  In March 4, 2002, at a duly

publicly noticed meeting, the Commission changed the designation on the land use map for the

Weiss property along with approximately seven other Comp Plan updates on other parcels of

land that had been joined together for collective update action.  Doc. 203, ¶ 362.

       After October 23, 2000, when the City denied the third extension and the property

reverted to the underlying use, one of the permitted uses available to Weiss was single family

residential home use (up to eight units per acre depending upon applicable zoning category).

(Shelley depo. at pp. 282-84; Third Hilliard Affidavit).   After October 23, 2000, the City has

never denied Weiss the ability to use his 940 acres of land for single-family residential use, and,

in fact, the City has processed applications for residential purposes, when asked by Weiss's

contract purchasers, or their assigns or vendees, for the Weiss 220 acre parcel. (Weiss 12/6/06

depo. at p.131; Third Hilliard Affidavit; Shelley depo. at pp. 282-84). Weiss also has a

silvaculture use of his 720 acre parcel, for commercial logging, and obtained a permit from the

City for that use in October, 2001. (Shelley depo. at pp. 283-85; Third Hilliard Affidavit). This

use alone has netted Weiss $750,000 in gross revenue over the years. (Weiss 12/7/06 depo. at pp.

194-95). Weiss still had the single family use and the silvaculture use after the City enacted

Ordinance 0-01-20 on March 4, 2002. (Shelley depo. at pp. 286).

       On June 19, 2002, four days after Weiss entered into the contract to sell his 220 acre

parcel, Weiss voluntarily withdrew his DRI Application for the proposed Greenways DRI

project, sending the City a letter, with a copy to the NCFRPC, stating:

       This letter formally withdraws my Application for Development Approval
       [ADA/DRI] for the Greenways of Gainesville Development of Regional Impact

submitted to the City of Gainesville, the Florida Department of Community
Affairs (FDCA), and the North Central Florida Regional Planning Council
(NCFRPC) for review on or about December 23, 1998. By copy of this letter I am
so notifying the FDCA and the NCFRPC of this withdrawal and requesting the
refund of any remaining monies held on deposit by the NCFRPC for the payment
of review costs incurred by the NCFRPC, accordingly.

(Ex. 583)

Three years after voluntarily withdrawing his DRI application, Weiss filed the instant

suit. The complaint consists of five counts, with some counts having many subparts. Count One

is titled, "Article 1 Section 10 & 42 U.S.C. § 1983 Violations" and contains four subparts. With

regard to Count One, part (a), Weiss charges the city with

[v]iolating and abridging Weiss's rights under Article 1 Section 10 by
unreasonably impairing and altering exiting obligations under the City's
Annexation Agreement with [Weiss] by changing the future land use designation
of his property thereby preventing Weiss from developing his property consistent
with the PUD zoning classification development rights secured by § 10 of the
contract.

Doc. 113, ¶ 53(a). The Court holds, however, that there is no genuine issue of material fact

regarding the viability of the Annexation Agreement after the failed referendum vote. As

discussed extensively above, the uncontradicted evidence, especially the text of the document

itself, indicate that a successful referendum vote for annexation was a bargained-for requirement

of the deal. Also, after the failed referendum and during the later voluntary annexation process,

nothing in the record supports a claim that the City made any representation that it would honor

the Annexation Agreement. Therefore, if Plaintiff intends his claim to include elements of

detrimental reliance or misrepresentation, said claim fails in this regard. Since nothing in the

record supports Plaintiff's claim of contractual liability on the part of the City, this part of the

Count is without merit.

In Count One, part (b), Weiss charged that the city violated his substantive due process

rights[6] by "amend[ing] its Comprehensive Plan by changing the future land use designation for

Weiss's property from PUD to single family residential."  Weiss argues

> This adverse final decision was contrary to the settled law of Florida which
> required the City to consider duly filed zoning applications under the existing
> land use designation of its comprehensive plan and prohibited the City from
> frustrating that process by applying vague un-codified ad hoc rules contrary to the
> Comprehensive Plan until it could be amended. The City's action was clearly
> contrary to its policies contained in the City's existing Comprehensive Plan,
> which required zoning and development to be consistent with a PUD and
> expressly required that the land use designation could only be changed by an
> amendment and upon proper notice.

Doc. 112, ¶ 53(b).  This claim fails for several reasons.  The Eleventh Circuit, in <u>Reserve, Ltd. v.</u>

<u>Town of Longboat Key</u>, 17 F.3d 1374 (11th Cir. 1994), explained that a substantive due process

analysis, within the deprivation of a property interest context, involves two queries.  <u>Greenbriar,</u>

<u>Ltd. v. City of Alabaster</u>, 881 F.2d 1570, 1577 (11th Cir.1989). First, was the plaintiff deprived

---

[6]The conceptual difference between substantive due process, procedural due process, just
compensation and takings claims has been troubling for Courts to determine.  As the panel stated
in <u>Eide v. Sarasota County</u>, 908 F.2d 716 (11th Cir. 1990):

> Courts have confused the standards for the first three claims (just compensation,
> due process takings, and arbitrary and capricious due process), and often one
> cannot tell which claim has been brought or which standard is being applied. <u>See</u>
> <u>Smoke Rise, Inc. v. Washington Suburban Sanitary Comm'n</u>, 400 F.Supp. 1369
> (D.Md.1975) ("a claim of deprivation of property without due process cannot be
> blended as one and the same with the claim that property has been taken for
> public use, without just compensation." (emphasis in original)); <u>Weissman v.</u>
> <u>Fruchtman</u>, 700 F.Supp. 746, 754-55 (S.D.N.Y.1988) (assuming <u>Williamson</u>
> <u>County</u> applies to arbitrary and capricious due process claims). This court has
> itself confused due process takings and arbitrary and capricious due process
> claims. <u>Greenbriar v. City of Alabaster</u>, 881 F.2d 1570 (11th Cir.1989) (applying
> <u>Williamson County</u> to arbitrary and capricious due process claim).

<u>Id.</u> at 722.  This confusion does not hinder the Court in the instant case, however, since Plaintiff's
claims fail regardless of which standard applies.

of a constitutionally protectible property interest? Second, assuming a property interest, was the deprivation of that "property interest for an improper motive and by means that were pretextual, arbitrary and capricious, and ... without any rational basis[?]" <u>Hearn v. City of Gainesville</u>, 688 F.2d 1328, 1332 (11th Cir.1982).

With regard to the first question, Weiss' asserted protectible property interest is "the settled law of Florida which required the City to consider duly filed zoning applications under the existing land use designation of its comprehensive plan and prohibited the City from frustrating that process by applying vague un-codified ad hoc rules contrary to the Comprehensive Plan until it could be amended." The Court disagrees with Weiss' assessment that the City failed to provide him with the "consideration" he demands. At the time that the PUD overlay was originally approved by the City Commission in August of 1994, after proper notice and public hearings, and with approval of Plaintiff, it contained language making clear that the overlay would naturally terminate if final zoning approval was not obtained by a certain deadline. With the Commission's October 23, 2000, vote to deny his third extension request, Weiss thus failed to secure the required PD rezoning by extended deadline. The PUD overlay automatically dissolved at that time, and the underlying future land use element of "Single Family" became in place after that vote by automatic reversion per the language of the Comp Plan.

This foregoing automatic reversion was self-effectuating and did not require any new "public hearings" because the very language in the Policies of the Comp Plan provided for this automatic reversion and had already been the subject of the required public hearings back in 1994, and had already been the subject of DCA review and approval, back in 1994.

The Court agrees with the City and the DCA that Plaintiff has pointed to no case or law that holds that the type of automatic "null and void" language (pertaining to the PUD overlay) in the City's Comp Plan or adopting Ordinance, was "illegal", "unlawful", "legally questionable", or "not in compliance" with Chapter 163, Fla. Stat. Also, none of cases cited by Plaintiff compel the conclusion that the automatic reversion language -- providing that the future use would revert back to the underlying "Single Family" land use in the City's Comp Plan or adopting Ordinance, upon nullification of the PUD overlay -- was "illegal", "unlawful", "legally questionable", or "not in compliance" with Chapter 163, Fla. Stat. Moreover, Weiss was provided with proper notice of this automatic reversion starting back in 1994, continuing through each of the two extensions that were granted, up until the October 23, 2000 Commission hearing. Indeed, in his letters approving the 1994 amendment, he expressly accepted the automatic reversion language.

The Court also finds that Plaintiff has offered no evidence contradicting the testimony of Mr. Hilliard (Doc. 203, ¶¶ 336-338), Pegeen Hanrahan (Doc. 203, ¶ 359) and the recommendations of the Planning Board Staff (Id. at ¶ 348) that the City Commission's efforts from December 2000 to March 4, 2002, regarding Mr. Weiss' land was merely to "clean up" the record by making the land use map match the land use plan. The city consistently held, and communicated to Mr. Weiss, its position that the October 2000 denial of the third extension request automatically terminated the PUD Overlay in the Comprehensive Plan (in accordance with the Comprehensive Plan), and that the subsequent action of amending the land use map was merely housecleaning to make the map catch up with the Plan.

The second reason this part of Count One fails is that the record in this case is undisputed that the City's motives in denying the final extension and thus letting the PUD Overlay expire

were their desire to stop excessive delay, inability to correctly assess traffic impacts, and concern over wetlands destruction.  The pages and pages of hearings, reports, assessments, deposition testimony, letters between the parties, and more, show that these motives were genuine and not "pretextual."  Traffic impact and environmental concerns are obviously core concerns for a City government.  Thus, these concerns are hardly pretextual, arbitrary, capricious, or without any rational basis.  See Reserve, Ltd., 17 F.3d at 1379.

The third reason this part of Count One fails is that it was the conduct of Weiss and his team which impaired his ability to have his project approved.  First, as described above, Weiss consistently failed to file a DRI application that was sufficient for agencies such as Florida Department of Transportation, NCFRPC and the DCA to sign off on his project.  These entities are not controlled by or alter egos of the City, and are not parties to this suit.  Yet it was their rejections of the Weiss' applications that caused his project to slip past the deadlines, and their denials were due to Weiss' team's inability to produce a sufficient application.

Moreover, before the City denied the final request in October of 2000, Weiss had been granted a hearing by the City concerning his application.  As noted above, Weiss chose to waive that hearing and continue to attempt workshops and further submission of information.  Later, in July of 2002, Weiss formally waived his right to a hearing with the NCFRPC and formally withdrew his DRI application.  Simply put, Weiss waived whatever process he was due.

These same arguments apply to Count One, part (c).  In this part, Plaintiff alleges that the City violated and abridged "Weiss's Procedural Due Process rights pursuant to an unconstitutional de facto policy and procedure of the City Commission that targeted Weiss and unfairly deprived him of a quasi-judicial hearing on his duly filed and pending DRI and zoning

applications."   As noted above, Weiss waived his right to a final hearing, and thus any

deprivation was caused by him alone.  Additionally, the record is replete with instances of the

City having meeting after meeting with the Weiss team, traveling to the property, holding

successive workshops, and drafting ordinances on his behalf.  For the City to finally say "enough

is enough" after 6 years of holding open the possibility for his project, is not an unfair

deprivation.  Even if the City itself had outright rejected his plan, such a decision would not have

been unreasonable considering the still unresolved concerns over traffic impact and

environmental protection.

　　　　With regard to Count One, part (d), Plaintiff charges the City with "Violating and

abridging Weiss's rights under the Equal Protection clause by intentionally singling out Weiss

for different treatment wherein the City refused to provide Weiss a hearing on his pending

development and zoning applications under the existing PUD future land use designation in its

Comprehensive Plan. "  As an initial matter, nowhere in the record does Weiss point to others

who were similarly situated but treated differently.  The analysis of Plaintiffs' equal protection

claim requires a finding that there were developments which were similarly situated to the

proposed development, because "[d]ifferent treatment of dissimilarly situated persons does not

violate the equal protection clause." Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1313 (11th

Cir. 2006), quoting  E&T Realty v. Strickland, 830 F.2d 1107, 1109 (11th Cir. 1987).  A

showing that two projects were similarly situated requires some specificity.  Campbell, 434 F.3d

at 1313.  In the zoning context, projects which seek different types of variances are not similarly

situated.  Id.  The complete absence of any comparators renders this claim meritless.

　　　　Additionally, if an equal protection claim is simply that the regulation treats the plaintiff

different from someone else and neither a suspect class nor a fundamental right is involved, the

regulation (and its classification) must only be rationally related to a legitimate government

purpose. Eide v. Sarasota County, 908 F.2d 716 (11th Cir. 1990).  Here, as discussed

extensively above, the City's refusal to continue the extensions was rationally related to the

legitimate government purposes of preventing wholesale delay of projects and of requiring

applications to fully set out the traffic and environmental impacts of the project.  Thus, his equal

protection claim fails as well.

Turning to Count Two, it is entitled "Breach of Contract" and is based upon the

Annexation Agreement.  As noted above, the Court holds that under the unambiguous language

of the agreement, it had no enforceability once the referendum failed.  Additionally, as noted

above, the City went out of its way to ensure that Plaintiff would not rely upon the belief that the

agreement was still valid.  As detailed above, Plaintiff tried several times to resurrect the

agreement and the City was clear that the agreement was considered to have expired.  Thus, the

City complied with its responsibility under the Contract to hold a referendum on the annexation.

Once that referendum failed, no other duties on the part of the City existed for the City to breach.

Count Three is entitled "Declaratory Relief" and contains conflated claims of detrimental

reliance, equitable estoppel and due process violations.  Paragraph 67 sums the Count up with

the following language:

> Since Weiss has also demonstrably relied to his substantial detriment on the
> representations and actions of the City at the time he consented to the annexation
> of his property and expended significant sums of money for its development, it
> would be unjust and highly inequitable to permit the City to destroy those vested
> rights through bad faith conduct that is also arbitrary and capricious under the
> doctrine of equitable estoppel. Such conduct would also be inconsistent with
> Weiss's due process rights under the Federal and State Constitutions.

He therefore seeks a judgment holding the City's ordinances involved in this case invalid. Complaint, ¶ 69.

As noted above, the City – before the final annexation of Weiss' property – made certain to clarify to Weiss that the annexation agreement was no longer in force. Any reliance by Weiss upon the expired agreement was thus unreasonable. Moreover, nothing in the record supports Weiss' continuous allegations that the City was unreasonable or duplicitous. On the contrary, the record shows the City, over a six-year period, working extensively with Weiss and his team to attempt to get his project moving. The City repeatedly warned Weiss about upcoming deadlines, clearly articulated what was required of him, and gave him multiple extensions. As noted with regard to Count One, there is nothing inequitable about the City saying, "enough is enough" once Weiss continued to fail to submit a sufficient application by the sixth year. Finally, the due process concerns involved in this case were discussed with regard to Count One, and should not have been repeated here.

In Count Four, entitled "Inverse Condemnation", the Plaintiff complains that the City demanded exactions that were unlawful because there "was no rational nexus or rough proportionality between the actual impacts of the projects and the financial responsibility demanded by the City from Weiss." Complaint, ¶ 73. Under the Supreme Court's decisions in Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), and Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), a burden imposed as a condition of permit approval must be related to the public harm that would justify denying the permit, and must be roughly proportional to what is needed to eliminate that harm.

This claim fails for the simple reason that the process never got far enough along for the

City to ever impose a specific burden as a condition of the permit approval. This is because Plaintiff's traffic assessment, in particular, was never accepted as making sense by any of the agencies such as FDOT and NCFRPC (which are not related to the City and not parties to this suit). <u>See</u>, for only one small example, the traffic assessment by Weiss' expert that the project would have no significant effect in 2008 on the intersection of NW 43rd St and NW 53rd Ave. Ex. 363, at pp. WEISS PR. 002647. NW 43rd St. is the road that runs through the property and NW 53rd Ave is the first major road that intersects NW 43rd Ave to the south. That it would have no impact from the development is incorrect on its face. See also the FDOT and NCFRPC responses to Weiss' traffic assessments, set out in Doc. 203, ¶¶ 483, 497 and 558.

Because the City was never given a traffic assessment by Plaintiff that was usable, it was never able to calculate a proposed figure to submit to Plaintiff. The City's difficulty in determining what burden to impose on Plaintiff for the future traffic impacts is exemplified by the frustration voiced in Public Works official Teresa Scott's memo of April 7, 1999. Doc. 203, pp. 219-20. In the memo, she discussed an offer made by the Weiss team for a "pipeline" payment to cover future traffic improvements necessitated by the project. Concerning whether the City should accept it, she noted,

> This is a difficult question to answer because the transportation consultant has not fully responded to review comments and a request for additional information made in a letter from Marlie Sanderson on January 19, 2000. I understand that the applicant is attempting to determine if he should proceed before incurring expenses for this additional analysis. However, staff has not agreed that the levels of significance identified in the ADA are reasonable.

After listing several examples of the traffic assessment's deficiencies, she concluded, "For these reasons, consideration of a payment value is nearly impossible at this point. We need to reach consensus on a mitigation strategy that is rational and fair, and will hold up under legal

scrutiny." Doc. 203, p. 220. In other words, the City was never able to impose a burden as a condition of approving the permit, because Plaintiff failed to ever submit an application that sufficiently described the traffic or environmental impact. Traffic impact and environmental concerns are clearly valid public harms to be avoided, but because of Plaintiff's deficient applications, the City was never able to determine what would be needed to eliminate those harms. In any event, Plaintiff is not able to demonstrate that the city imposed any burden as a condition of his application's acceptance that was not roughly proportionate to that needed to eliminate the traffic impact and environmental concerns of the FDOT, NCFRPC and the City. Therefore, this Count fails.

To the extent that Count Five, also entitled "Inverse Condemnation", relies upon a supposed imposition of a burden by the City, the claim is denied for the same reasons as Count Four, above. The City was never able to impose a burden on Plaintiff because the Plaintiff's traffic assessments were insufficient to allow the City to calculate the burden Plaintiff would have to take up.

The heart of Count Five appears to reside in Paragraph 84, in which Plaintiff claims that he is entitled to "just compensation for the temporary taking of his property and in the alternative, compensation for the diminution in the value of his property if the taking is permanent." The Court holds that the evidence in the case is undisputed that no taking occurred here, under any of the theories explained by the Supreme Court in Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 125 S.Ct. 2074 (2005). First, there is no evidence in this case that the City required anyone to suffer a permanent physical invasion of his or her property -- however minor. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d

868 (1982) (state law requiring landlords to permit cable companies to install cable facilities in

apartment buildings effected a taking).  Second, the Plaintiff has not put at issue whether the

City completely deprived Plaintiff of " all economically beneficial us[e]" of his property.  Lucas

v. South Carolina Coastal Council, 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120 L.Ed.2d 798

(1992).  As described above, Plaintiff may still subdivide the property and build single family

homes, eight to an acre.  Also, he has engaged in silvaculture, which is an economically

beneficial use of the property, and has received multimillion-dollar offers for the property.

Third, Plaintiff cannot show that  "[t]he economic impact of the regulation on the

[Plaintiff] and, particularly, the extent to which the regulation has interfered with distinct

investment-backed expectations" rises to the level of a taking.  Penn Central Transp. Co. v. New

York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).  The Eleventh Circuit in

Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570 (11th Cir. 1989), applied this test and

instructed:

> A takings claim requires a showing that the challenged action has deprived an
> owner of all or substantially all economically beneficial use of his property. See
> First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S.
> 304, 107 S.Ct. 2378, 2389, 96 L.Ed.2d 250 (1987) (expressly limiting
> holding-that landowner may recover damages before final determination that
> regulation constitutes a taking-to situation where "the ordinance in question
> denied appellant all use of its property"); id., 107 S.Ct. at 2393 (Stevens, J.,
> dissenting) ("a regulatory program that adversely affects property values does not
> constitute a taking unless it destroys a major portion of the property's value ...
> only the most extreme regulations can constitute takings."); Penn Central
> Transportation Company v. City of New York, 438 U.S. 104, 131, 98 S.Ct. 2646,
> 2662-63, 57 L.Ed.2d 631 (1978) (Mere diminuntion in value of property because
> of land use regulation does not by itself constitute a taking).

Id. at 1576 n.11.  Here, as discussed above, even if the City can be considered to have issued a

final decision denying the project outright,  such action cannot be considered a taking because

Plaintiff has various beneficial uses of his property and the property retains considerable value.
Finally, even under the <u>Nollan/Dolan</u> unlawful extractions line of cases, Plaintiff is not entitled
to relief. As discussed above, the Plaintiff has not provided evidence that the City ever finally
required any specific exaction for his project to go forward. Instead, his own inability to
complete the application process with meaningful traffic and environmental analysis prevented
the City from taking such action.

In sum, for the above reasons, Defendant is entitled to judgment in its favor on all counts
of Plaintiff's Amended Complaint.

The Court has a host of other motions outstanding, all of which need not be addressed in
light of this ruling. First, docs. 118, 128, 133, 135, 145, 169, 187 and 188 all involve efforts by
the City to obtain discovery from Mr. Weiss, and the subsequent efforts by a Special Master to
resolve the issues. Because the Court has decided this case in favor of the City, the motions are
moot at this time and are denied. Likewise, docs. 220, 221, 226, 239, 240, 242, 282, and 338,
relate to efforts by the City to exclude or strike evidence or witnesses submitted by Mr. Weiss.
Since the Court has decided this case in favor of the City, the motions are moot at this time and
are denied. Docs. 189 and 313, are Plaintiff's motions to re-open discovery to allow the
deposition of Norman Bowman. The Court denies those motions as Plaintiff did not show due
diligence in waiting three months before attempting to reset the deposition of Mr. Bowman.

Docs. 154 and 281 are two motions by Plaintiff to strike an affirmative defense and the
Defendant's motion for summary judgment. Courts generally disfavor granting motions to strike.
<u>Lake Lucerne Civic Ass'n v. Dolphin Stadium Corp.</u>, 801 F.Supp. 684, 694 (S.D.Fla.1992)
(citing <u>Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.</u>, 677 F.2d 1045,

1057 (5th Cir.1982)), and the undersigned sees nothing in either document by Defendant that justifies such drastic remedy.   The motions are denied.

Docs. 267, 276 and 277 involve experts whose testimony concerned damages in this case. Since liability was not established, these opinions about damages are not relevant at this juncture and were not considered by the Court.  These motions are thus denied as moot.

In Doc.  233 and Doc.  236, the Plaintiff moved to strike the opinions of experts Delegal and Hammer.  The Court agrees that both rendered essentially legal conclusions which the Court did not consider in reaching its own legal conclusion.  The motions are denied as moot. Likewise, the Court in considering whether the Plaintiff had issued a sufficient application concerning traffic or environmental concerns did not consider the opinions of the City's experts, Peter Gottfried or Roy Chapman, but instead considered the actual responses provided by FDOT and NCFRPC.  Thus, the motions to exclude their opinions, Doc. 274 and 275, are denied as moot.

In Doc. 345, the City moved to be able to supplement its summary judgment motions. However, because the Court has decided in the City's favor, this issue is moot at this time and denied.  Finally, the Court grants Doc. 414, attorney Sarah Maroon's motion to withdraw as attorney.

In sum, it is hereby

**ORDERED AND ADJUDGED:**

The motion to withdraw as attorney, Doc. 414, and the motion for summary judgment on behalf of the City, Doc. 201, are granted.

The remaining pending motions are all denied.

Judgment shall be entered on behalf of the City and against the Plaintiff.  The Clerk is directed to close the file.

**DONE AND ORDERED** this  *23rd*   day of March, 2010


            *s/Maurice M. Paul*
        Maurice M. Paul, Senior District Judge